### REUBEN C. RUTHERFORD *et ux.*

*v*

### MARY A. MORRIS *et al.*

1. VERDICT—*on bill to contest will.* A verdict upon a bill to set aside a will stands upon the same footing as a verdict in an ordinary action at law. The issue in such a case is not a feigned, but a real, one, required by statute, and is not simply advisory to the chancellor.

2. EVIDENCE — *opinions of experts as to mental capacity.* Upon the question whether a disease had reached such a stage, at a given time before it had developed itself, that the subject of it was incapable of making a will or contract, or was irresponsible for his acts, the opinion of his neighbors—men of good, common sense—is of more value than that of medical experts.

3. WILLS—*old age and disease as disqualifying a party from making a will.* Old age and disease are not, of themselves, sufficient to incapacitate a party from making a valid disposition of his property by will, when no undue influence is practiced. Even softening of the brain two years

prior to the making of the will, will not invalidate it, if the testator, at the time of making the same, was capable of transacting his ordinary business affairs.

4. Same—*undue influence.* Fraud or undue influence, to avoid a will, must be directly connected with its execution. The fact that the testator was influenced by the devisee, in the ordinary affairs of life, does not show that the latter used undue influence in procuring the execution of a will subsequently made.

5. The influence exercised over a testator, to avoid his will, must be of such a nature as to deprive him of free agency, and render his act obviously more the offspring of the will of others than his own; and it must be specially directed toward the object of procuring a will in favor of particular parties, and must be still operating at the time the will is made.

6. Influence and persuasion may be fairly used; and a will procured by honest means, by acts of kindness, attention, and persuasion which delicate minds would shrink from, will not be set aside on that ground alone. The influence, to vitiate the will, must not be the influence of affection or attachment.

7. The fact that the beneficiaries of a will are those by whom the testator was surrounded, and with whom he stood in confidential relations at the time of its execution, or that the principal beneficiary has for years had the exclusive management of the testator's property, or that the provisions of the will for the benefit of such person may seem grossly unreasonable or unequal, is no ground for inferring undue influence.

8. Same—*prior declarations as evidence.* The fact that a testator, many years before making his will, expressed an intention to leave his property to his children equally, affords no evidence of undue influence or mental incapacity, where a different disposition of his property is made, and such testimony should not be admitted in a proceeding to contest the validity of the will.

9. Same—*instructions on contest should be accurate.* From the fact that juries are not slow to set aside a will if it does not comport with their ideas of right and justice, they should be accurately instructed as to the law, and no improper or irrelevant testimony should be allowed to go to them to draw their attention from the true issues.

10. Same—*the equity or inequity of a testamentary disposition of property not a subject of inquiry on contest of a will.* On a bill to contest a will, the equity or inequity of a testamentary disposition of property by a testator of sound, disposing mind, is not a subject of inquiry by the jury, and the inequality of the disposition of the testator's property can not be urged as proof of undue influence, in the absence of other competent proof of that fact.

APPEAL from the Circuit Court of Adams county; the Hon. JOSEPH SIBLEY, Judge, presiding.

Messrs. LAWRENCE, WINSTON, CAMPBELL & LAWRENCE, Messrs. SKINNER & MARSH, and Mr. WILLIAM MCFADON, for the appellants.

Messrs. WHEAT, EWING & HAMILTON, Mr. H. L. WARREN, and Mr. JACKSON GRIMSHAW, for the appellees.

Mr. JUSTICE BREESE delivered the opinion of the Court:

This was a proceeding, on the chancery side of the circuit court of Adams county, to contest the validity of the last will of John P. Robbins, late of that county, deceased.

The will in question purports to have been executed on the third day of May, 1866, all the forms of law having been observed, but when offered for probate, it was refused probate. On appeal to the circuit court, this judgment was reversed, and the will admitted to probate. This bill in chancery followed.

The grounds of attack were, *first,* incompetency of the testator to make the will, and *second,* undue and improper influence exercised over the testator by Reuben C. Rutherford, leading to its execution.

The jury found the issue for the contestants, and, having overruled a motion for a new trial, the court, by its decree, declared the instrument produced was not the last will and testament of John P. Robbins.

To reverse this decree, the proponents of the will appeal, and assign various errors.

We have examined the record with great care, and given to the testimony full consideration, and submit the conclusions we have reached.

It appears. the testator. John P. Robbins, emigrated from the State of New Hampshire to Adams county, settling near Quincy, as a farmer, in 1829. He had a good education,

and, by diligence and the proper application of his talents, acquired quite a fortune, chiefly in real estate. From the testimony of more than sixty witnesses, who had known the testator intimately for more than thirty years up to the time of making his will—who saw him, had frequent intercourse with him, and transacted business with him occasionally during all this time—it would appear he was a man of more than ordinary vigor, of strong mind and decision of character, and a good man, whose sympathies and heart were very kind, combining intelligence and virtue—as well made and balanced as most men. He was a good reasoner, and not easily converted to the opinions of others; of decided principles and views, and could not be easily influenced. When he formed opinions, they were very fixed; had a good mind and sound judgment; was an honest man, who intended to do right.

This was his condition up to June, 1869, when he was stricken with paralysis, of which the record gives an imperfect account.

It further appears the testator had, at the time of making his will, a wife, who did not survive him, and two daughters surviving him. A third daughter had died, leaving children by two different husbands, and who were living at the time of the execution of the will. To these daughters the testator had long before conveyed, by deed, real estate near Quincy, in his judgment of equal value. His eldest daughter was Mary Ann, who had many years before intermarried with Isaac N. Morris, of Quincy, and who was understood to be the possessor of a handsome fortune. They had long been absent from the paternal home, rearing a family of their own, in affluence and abundance.

Rebecca Maria was the only remaining child. She seems to have been a favorite child; and on her marriage with Reuben C. Rutherford, in 1854, she, with her husband, continued inmates of her father's house, Rutherford, himself, apparently with the approbation of Robbins, taking charge

of much of his business, and, in coöperation with Mrs. Robbins, of their domestic establishment. all seeming to live in the greatest harmony, each bestowing and each inspiring confidence.

During the rebellion, Rutherford was. for a considerable portion of the time, in the military service of the United States. on duty in distant States, varied by occasional visits to his home, in Quincy. He was so absent in May, 1866, when the will in question was executed. and it was executed under these circumstances: On the second day of that month, the testator being then about seventy-two years of age, and, in appearance, in the judgment of all who knew him, in the full possession of all his faculties, physical and mental, went, unaccompanied, to the office of Goodwin & Davis, practicing lawyers of good standing in Quincy, where he remained some time in consultation with Mr. Goodwin, in the inner office, the outer room being occupied by Mr. Davis. Goodwin took notes of the conversation on sheets of paper.

The next day, or day after, unaccompanied as before, Robbins returned to the office, and again conferred with Mr. Goodwin, then returned to the outer office, and, pointing to the paper lying on Goodwin's desk, invited Davis to witness the paper as his will, it having been signed by Robbins, which Davis did, and Goodwin, since dead, also signed it as witness. Davis was the only surviving witness to the execution of the will. He knew the testator well, and testifies he was, at this time, of sound mind and memory. Robbins took the will with him when he departed, unattended as he came. What disposition he made of the will, does not appear. It is not shown any member of his family knew anything about it, or knew he had made a will. From this date—May 3, 1866 —the testator continued his usual course of life, until, some time in June, 1869, more than three years thereafter, he was stricken with partial paralysis, which did not wholly incapacitate him, and four years thereafter, on the 12th of June, 1873, he died, in the midst of his family, then consisting of

26—77TH ILL.

402          RUTHERFORD *et ux. v.* MORRIS *et al.*     [Jän. T.

Opinion of the Court.

his daughter, with her children, and Dr. Rutherford, Mrs. Robbins having died some time previously.

By this will of May 3, 1866, appellant Reuben C. Rutherford was appointed sole executor, without being required to execute a bond. To his widow he devised his whole estate, real and personal, during her life; to Mrs. Morris, the appellee, one or more valuable tracts of land in Adams county, subject to the life estate of her mother; to Mrs. Rebecca Rutherford, wife of the executor named, other tracts of valuable land, and his homestead, in the same county. subject to the same life estate, and also all the personal property which might remain after the death of the widow; to the children of his deceased daughter, Harriet Warren, he made certain specific devises of real estate. The devise to Mrs. Rutherford, it is claimed, equals in value two-thirds of the whole estate.

The first point made by appellants is, as to the weight to be given to the verdict of the jury. They insist that the verdict, in such cases as this, is nothing more, and entitled to no greater consideration, than a verdict rendered on a feigned issue out of chancery—that it is designed merely to inform the conscience of the judge, and which he may wholly disregard.

We do not approve this view. The statute is express, when a will is attacked for any of the causes specified, by bill in chancery, "an issue at law shall be made up, whether the writing produced be the will of the testator or testators or not, which shall be tried by a jury in the circuit court of the county wherein such will, testament or codicil shall have been proved and recorded as aforesaid, according to the practice in courts of chancery in similar cases."

In chancery, it is the received doctrine, an issue directed thereout, upon a disputed fact supposed, being directed by the judge on his own motion, a verdict upon such an issue is merely advisory, which the judge can disregard in arriving at his conclusions; but the issue in this case was not a feigned,

but a real, issue, directed by the statute upon real facts, which the jury were sworn to try, and their finding must have the effect of a verdict rendered in any other cause upon an issue made up for trial. This was the view entertained by this court in *Brownfield* v. *Brownfield*, 43 Ill. 155, and we see no necessity for. changing it.

Giving to the verdict in this case the same weight accorded to verdicts rendered on ordinary issues at law, the consequence follows, the verdict must stand, if there be evidence sufficient to support it. And the rule is equally well settled, if there be a great and decided preponderance of evidence against the finding, the verdict will be set aside, and the more urgent is this command if it shall appear from the whole record that injustice has been done.

Impressed with the great importance of this case to the parties litigant, and considering the large amount of property involved, some one hundred thousand dollars or more, we have bestowed all the attention to this record in our power to bestow, and have permitted no important fact to escape us, and we are well satisfied it furnishes no sufficient evidence of mental incapacity of the testator at the time he made the will in question, nor any evidence of any undue influence exerted by any one over the testator, to induce the making of the will.

The testimony to sustain the first ground of attack, that of mental incapacity of the testator, is that of Moses F. Bassett, who had been, for some years prior to, and up to 1864, two years before the will was made, the family physician of the testator, and who was examined as an expert, and who testified he had no intercourse with the testator from 1864 up to December, 1870, supplemented by the testimony of Dr. Wilson, who did not know the testator, who had heard the testimony of Dr. Bassett, and who said he thought the facts stated by him, disconnected from the cause, would hardly designate what the testator's real condition was, and who said, "absolutely and necessarily, paralysis might occur in 1869, without there having been any softening of the brain in 1866, and

that persons have paralysis without softening of the brain, and that brain-softening is not necessarily connected with premonitory symptoms of paralysis;" and by Dr. Curtis, who did not hear Bassett's testimony, but had seen the testator in 1871 and 1872, and personally knew nothing about him previously, but who could not testify there was any softening of the brain in 1866; and Dr. Byrd, who never knew or saw the testator, but who says, if a man was stricken with paralysis in 1869, it would not establish that he was afflicted with softening of the brain in 1866, and that Robbins might have been stricken with paralysis in 1869 and have been a sound man in 1866—paralysis follows other diseases besides softening of the brain; and Mrs. Hannah C. S. Brown, a sister of Mrs. Robbins, a resident of Hancock county, whose visits to the family were not very frequent, the last being in 1865, who testified, in these visits Robbins would tell her of his having been sick, and of the doctor visiting him, of pain in his head, affection of the eyes; he would come in flushed; his bald head "would show a flushed appearance;" he would lie down, and her sister would bathe his head, and he would be better; spoke of his eyes being sore and paining him; he did not say much of these attacks, but he seemed more feeble after them; could not endure labor as well, nor walk as far, because, he said, it pained him in the bottom of his feet sometimes; there was a place there he complained of; did not see him in any of the attacks after he moved into his new house; did not complain of dizziness at these times; he complained of this flush and rush of blood; that he would shed tears readily, especially on coming to very fine passages, when they were reading to each other, his voice, if he was reading, would be choked, and if she was reading, his tears would fall.

These doctors were summoned by the contestants, as "experts," for the purpose of invalidating a will deliberately made by a man quite as competent as either of them to do such an act; they were the contestants' witnesses, and so considered themselves, Dr. Bassett especially, whose whole testimony is

pregnant with such indications. The *testimony of* such is worth but little, and should always be received by juries and courts with great caution.

It was said by a distinguished judge, in a case before him, if there was any kind of testimony not only of no value. but even worse than that, it was, in his judgment, that of medical experts. They may be able to state the diagnosis of the disease more learnedly, but, upon the question whether it had, at a given time, reached such a stage, that the subject of it was incapable of making a contract, or irresponsible for his acts, the opinion of his neighbors, if men of good, common sense, would be worth more than that of all the experts in the country.

The question in this case is, was there *senile dementia,* no matter how occasioned, of this testator, on the third day of May, 1866, the day he made his will? Is there any evidence of imbecility of old age at this time? Not one witness so testifies. There is not a particle of proof such was the condition of the testator at that time, or at any time prior thereto, or subsequent, until stricken by paralysis. No man has had the hardihood to testify, in this case, that there was the least weakness of intellect at this time. More than sixty witnesses, of good, common sense and observation, knowing the testator well, men of the highest character, and of unquestioned judgment, all concur, with extraordinary unanimity, that, up to 1869, no man excelled him in intellectual or physical vigor. There is no dissentient voice; all testify to the same effect. Is there any medical testimony sufficient to overturn this? Taking it to the extent claimed for it, it fails to establish mental incompetency when the will was executed.

What is the amount of this medical testimony? Dr. Bassett, the leading expert, says he was the family physician of the testator in 1864, and for several years previous; that the testator was subject to occasional attacks of fever, attended with pain in the head, delirium, nausea, etc., which the

doctor attributed to congestion of the brain; that the attacks lasted, generally, three or four days, and were relieved by the ordinary treatment usual in like cases; that at the time, these symptoms did not excite in his mind any suspicion of softening, or other organic disease of the brain, but that, years afterwards, in 1869, when the testator had been attacked with paralysis, he, the doctor, then connected these symptoms with a supposed softening of the brain, which he then conceived might have existed from the date of his last attendance upon him, in 1864.

Now, what was there in the symptoms of these periodical attacks to warrant the supposition that they indicated cerebral softening? Pain in the head, delirium, nausea—these, as we all know, from our own observation, are closely allied to, and are the not unusual concomitants of, any form of fever, and it needs no doctor to instruct us that they generally pass off, leaving no trace of evil effect behind, either on the bodily health or mental vigor. Every day's observation teaches us this. It is notorious, that some persons are highly delirious when under a slight attack of fever. All the head disturbances pass off with the fever which induced them, and the patient is soon restored to his wonted mental and bodily condition. We need no books or doctors to inform us that the symptoms in the case of this testator were merely the ordinary symptoms of fever of almost every kind, and do not, in our judgment, taken in connection with the testimony of the testator's many neighbors and intimate acquaintances, warrant the conclusion there was active congestion of the brain in any of the attacks prior to 1869, much less that inflammatory softening followed these attacks. How few of us have escaped distressing periodical headaches—this temporary prostration of body and mind? The neighbors of the testator, who saw him and conversed with him almost every day during these attacks, and afterwards, never perceived they had any effect upon his mental or bodily vigor.

We do not think the evidence satisfactorily shows that any of the ordinary symptoms of cerebral softening existed in the case of this testator at the time he made his will. No one has testified there was any paralysis or weakness of the muscular system, other than such as might be expected from advancing age ; no marked diminution of mental powers. Indeed, the principal reason for supposing the mental powers were failing is found in the testimony of Mrs. Brown, and that was, that the testator was easily moved to tears on the recital of fine poetry, or when in an excited state of feeling. If this is to be received as evidence of mental imbecility, or softening of the brain, many persons who now enjoy high public distinction, and remarkable for strength of mind and great business capacity, might deserve the care of a conservator at least.

These experts tell us, as do the books, there is no necessary connection of softening of the brain and apoplexy, or paralysis, nor does cerebral softening usually proceed at a slow pace of years before death ensues.

On a careful review of the testimony of these *experts*, we are unable to discover anything in the symptoms and history of this case justifying the conclusion of Dr. Bassett, that the testator was suffering from cerebral softening. If mental imbecility did exist, it must have arisen from some other cause, and we feel confident we will be more likely to arrive at a just estimate of the mental condition and business capacity of the testator by relying on the accordant testimony of his life-long acquaintances and neighbors, with whom the testator was in frequent intercourse, rather than from the testimony of these medical gentlemen, and so should the jury.

If we give heed to such testimony, and suffer it to prevail against the flood of proof in favor of the testator's competency, we should be doing great wrong, and departing from the rules we have laid down in like cases, to which we will hereafter refer.

It must be apparent to every one, but few wills could stand the test of the fanciful theories of dogmatic witnesses, who

bring discredit on science, and make the name of "expert" a by-word and a reproach. We concur with the judge above referred to: we would not give the testimony of these common sense witnesses, deposing to what they know and saw almost every day for years, for that of so-called *experts*, who always have some favorite theory to support—men often as presumptuous as they are ignorant of the principles of medical science.

It is upon the ground of *senile dementia*, chiefly, this case rests. As this is wholly disproved as existing at the time of the execution of this will, or at any time previous, the verdict should have been for the proponents of the will. What is the effect of old age upon testamentary capacity, is a subject which has received the attention of all courts, this among them; and it has never been held, any where, that age alone denotes incompetency. In *Watson* v. *Watson*, 2 B. Monroe, 74. one eighty-six years old, and afflicted with disease, was held competent to execute a will. So, also, one of eighty years of age, with energies greatly impaired. Ib. 79. In *Van Alst* v. *Hunter*, 5 Johns. Ch. 148, Chancellor KENT said, in regard to the will of a person between ninety and one hundred years of age : "A man may freely make his testament, how old soever he may be. It is one of the painful consequences of extreme old age, that it ceases to excite interest, and is apt to be left solitary and neglected. The control which the law still gives to a man over the disposal of his property, is one of the most efficient means he has, in protracted life, to command the attention due to his infirmities. The will of such an aged man ought to be regarded with great tenderness, when it appears not to have been produced by fraudulent acts, but contains those very dispositions which the circumstances of his situation and the course of the natural affections dictated."

Admitting this testator had softening of the brain in 1864, which is not proved, still, if he retained capacity sufficient to transact his business, and knew the state of his affairs, his

property, and the claims of his children, and acted understandingly, the will can not be rejected.

This court said, in *Lilly* v. *Waggoner*, 27 Ill. 395, that a want of mental power must be such as to render the testator incapable of acting rationally in the ordinary affairs of life, or incapable of understanding the effects and consequences of his act; and further, that legal soundness of mind, until inquest had, is a presumption of law, to be overturned by proof only of incompetency at the time of the act in question.

In *Trish* v. *Newell*, 62 ib. 196, it was said, that prior incompetency or insanity of the testator, arising from accident or temporary disease, does not presume *after* incompetency to make a will; it is enough if the testator understand the nature of the business in which he is engaged; has recollection of the property he intends to devise; of the persons who are the objects of his bounty, and of the manner in which it is to be distributed among them. And the court further said, that the best form of expressing the law as to the mental capacity is, were the testator's mind and memory sufficiently sound to enable him to know and understand the business in which he was engaged at the time he executed the will. The same doctrine was announced in *Yoe* v. *McCord*, decided at the September term, 1874, (reported in 74 Ill.,) and in *Meeker* v. *Meeker*, decided at the same term, (75 Ill. 260.) where it was said: "The law has adopted the rule that, where persons have arrived at full age, the presumption must be indulged, that the party has the requisite capacity to enter into, and bind himself by all lawful engagements, and, amongst others, may dispose of his property by testament; and to avoid these acts, the presumption must be rebutted by showing a want of sufficient intellectual capacity to make the agreement or the disposition of his property by will. Like all other matters relating to the human mind, it is difficult to fix any precise, undeviating rule by which it can be determined when a person has mind and memory.

. "And further, it is a rule of law, that a person who is capable of transacting ordinary business, is also capable of making a valid will. It is not required he shall possess a higher capacity for that, than for the transaction of the ordinary affairs of business."

Further on the court say: "And the usual test is, that the party be capable of acting rationally in the ordinary affairs of life."

. Testing this case by this rule, it is impossible for any man to say, with truth, that the testator, on May 3, 1866, was not capable of making a will. The whole weight of the testimony of more than sixty intelligent witnesses, the familiar acquaintances of the testator, is, that up to the time of the paralytic stroke, in 1869, and during all the years prior thereto, he was a man remarkable for his physical and mental power. No one of his numerous acquaintances, with whom he freely mingled, had the slightest suspicion of unsoundness of mind or memory, or a weakening. even, of his mental power, save the testimony of Doctor Bassett, that in 1864, and prior thereto, he had occasional attacks of fever and headache, not incapacitating him, however, from attending to his ordinary business. That there is no necessary connection between these and the paralytic attack of 1869, is shown by the medical testimony produced by appellees. But suppose the testator had incipient softening of the brain in 1864, there is no proof it incapacitated him from the transaction of ordinary business. The proof is ample that it did not, and his testamentary act is within the rule established by this court in the cases cited. We find no sufficient evidence of mental incapacity.

The next point is, the will was the result of undue influence exercised over the testator by Reuben C. Rutherford.

The principal witness to establish this is Edgar R. Morris, the son of appellee, Mrs. Morris. Mrs. Brown's amounts to nothing. There is nothing whatever in his testimony tending to show undue influence of Rutherford, or of any other per-

son, exercised upon the testator to make this will. The witness was always on the best- terms with his grandfather, whom he visited quite frequently; thinks Rutherford had a good deal of influence over him; noticed it in his manner of life; he, (his grandfather,) as most western farmers do, had lived on corn bread. bacon and coffee; he changed his diet, as he said, by Rutherford's advice; he got him to drinking weak tea, and eating beef, as pork was not healthy; got him to quit the use of pepper to a greater or less extent, and on a great many occasions, Mr. Robbins would quote Dr. Rutherford as to whether this dish was right and that wrong; this the witness noticed within one or two years after the marriage of Rutherford. He further says, he can only answer as to the influence of Dr. Rutherford over the testator, by stating circumstances which occurred. That influence increased up to 1866. Witness was at the house of testator, on Broadway, when he lived in the Mt. Joy place, and offered him a segar. He (Robbins) said the Doctor thought it was best not to smoke, and he had kind of promised not to smoke; but, said he, "I like a segar occasionally; let's go behind the stable and sit down and smoke, and have a chat." He further says, his grandfather was a very industrious man, and one day he asked his grandfather what Dr. Rutherford was going to do, as it was getting to be neighborhood talk that the Doctor was not doing anything. The old gentleman said he thought it was time the Doctor did something, but the old lady, his grandmother, said the doctor was a literary man; was getting ready to write a book; could not work now; was not his nature; was not made for that purpose; all they wanted him to do was, to care for their old age, and attend to Mr. Robbins' business. This was in 1858 or 1859, before they moved into the new house; and about building that house, this witness thinks the Doctor exerted his influence over Mr. Robbins.

It seems the family had overruled Mr. Robbins and had the house built in the city, on Twenty-fourth street, conve-

nient to church, schools and places of amusement. This was the work of the doctor and his grandmother. Though it was not exactly the kind of house the old gentleman would have preferred, he yielded to their wishes, as they had "set their hearts upon it." "They" was understood to mean, his daughter Maria, Dr. Rutherford and his grandmother. On one occasion, in 1865 or 1866, witness went to Mr. Robbins to borrow a reaper; he said witness would have to see the doctor, as he had charge of the reaper. This was in 1866. Declining to speak to the doctor about it, the old gentleman said he would speak to "grandma" about it, and witness got the reaper and took it home.

This is the substance of all the evidence on the question of undue influence, and that such trivialities should be introduced into a court of justice, and against the objections of the opposite party, excites surprise. They fail to touch the question of the execution of the will.

In *Brownfield* v. *Brownfield, supra,* it was said, that fraud or undue influence, to avoid a will, must be directly connected with its execution ; that, although the testator acted under the advice of the devisee in his ordinary affairs, and was influenced by that advice, such relations and influence would not tend to prove that he used undue influence in procuring the execution of the will.

In *Carmichael* v. *Reed,* 45 Ill. 108, this court said, that a wife, who was the principal devisee in the will of her husband, might lawfully exercise the natural and proper influence of her position to induce the testator to make a will appointing her executrix, giving her what the law allows, and preferring her children over those by a former wife.

In *Roe* v. *Taylor,* ib. 485, this court said, the rule is, that the influence exercised must be of such a nature as to deprive the testator of his free agency, and that neither advice nor argument, nor persuasion would vitiate a will freely made and from conviction, though the will might not have been made but for such advice and persuasion ; that the

influence to avoid a will must be such as to destroy the freedom of the testator's will, and thus render his act obviously more the offspring of the will of others, than his own; and that it must be an influence specially directed toward the object of procuring a will in favor of particular parties.

That these rulings are in strict harmony with those of other courts will be seen from the following citations: It is said in 1 Redf. on Wills, ch. 10, p. 523, that the influence to avoid a will, must be such as to destroy the freedom of the testator's will, and thus render his act obviously more the offspring of the will of others, than of his own; that it must be an influence specially directed towards the object of procuring a will in favor of particular parties; that if any degree of free agency or capacity remained in the testator, so that, when left to himself, he was capable of making a valid will, then the influence which so controls him, as to render his making a will of no effect, must be such as was intended to mislead him to the extent of making a will essentially contrary to his duty.

This influence, to avoid a will, must be one still operating at the time the will is made, and producing that perversion of mind which made the will. Ib. 524.

It is said, a will is set aside in such cases on the ground it is not an honest will—that it does not reflect the unbiased intent or wishes of the testator, but, on the contrary, had been extorted or procured from the deceased in the weakness or imbecility of old age or disease, or by artifice, deceit or imposition, or by persistent importunity, amounting to a species of coercion or moral duress; undue influence, in this sense, being a fraud, and, for the fraud, it is not the act, deed or will of the deceased. Upon no other ground has the court a right to set aside a deed or will, executed by a person of sane mind or memory, when the execution of the same was not procured, and the free agency of the party overcome, by some constructive coercion, duress or fraud. *Kinne* v. *Johnson*, 50 Barb. 70; *Tyler* v. *Gardner*, 35 N. Y. 610; *Tyson* v. *Tyson*, 37 Md. 567; *Eadie* v. *Sampson*, 26 N. Y. 11.

In *Miller* v. *Miller*, 3 Serg. & Rawle, 269, it was held, that influence and persuasion may be fairly used; and a will procured by honest means, by acts of kindness. attention, and importunate persuasion which delicate minds would shrink from, would not be set aside on that ground alone. Influence, to vitiate an act, must not be the influence of affection or attachment; it must not be the mere desire of gratifying the wishes of another, for that would be a very strong ground in support of a testamentary act. *Mountain* v. *Bennet*, 1 Cox, 355.

It was held, in *Rabb* v. *Graham*, 43 Md. 9, that advice, persuasion or entreaty does not constitute undue influence. Nor will love, affection and gratitude afford ground from which undue influence may be inferred. *Kinne* v. *Johnson*, 50 Barb. 70, *supra*.

The fact that the beneficiaries of this will are those by whom the testator was surrounded, and with whom he stood in confidential relations at the time of its execution, is no ground for inferring undue influence. *Wilson* v. *Moran*, 3 Bradf. 185. Nor even when the principal beneficiary has, for years, had the exclusive management of the testator's property. *Reynolds* v. *Root*, 62 Barb. 251. Nor when the provisions of the will, for the benefit of such person. may seem grossly unreasonable or unequal. *Brown* v. *Mattison*, 3 Wharton, 131; *Jackson* v. *Jackson*, 39 N. Y. 153; *Clapp* v. *Fullerton*, 34 ib. 97; *Blacker* v. *Lynch*, 1 Bradford, 471.

These being generally received principles governing cases of this kind, this case, tested by them, fails to show any undue influence in procuring the execution of this will.

That Doctor Rutherford, from his position—the husband of the testator's youngest and favorite child, as it would seem, residing in his family as his own—should have acquired some influence over the testator, is not to be questioned. It was manifested in inducing the testator to quit a bad habit, and to regulate his diet on sanitary principles; to erect a more imposing edifice in a more agreeable quarter than was originally intended;

but that the doctor was influential in the latter is not shown, though there can be no doubt he aided his wife and her mother in their efforts to that end. They were determined to have a fine house in a fashionable quarter. The testator had the means with which to build it, and no doubt felt a secret gratification, when occupying it, that he had yielded to their importunities.

It is urged that these facts show an influence over the mind of the testator. Granted, but it is not such an influence as the books condemn as undue, when the execution of the will is considered.

There is not a word of proof that any of the beneficiaries of this will exerted a particle of influence towards its execution, or that Rutherford even knew of it until after Robbins' death. At the time of its execution he was absent from the State, and not a word or syllable of his is brought up against him, to charge him with suggesting any portion of it, or his daughter or her mother either. From all appearance, it was the unprompted act of the testator. He went alone and unattended from his home, distant a mile and a half from Quincy, to the office of a prominent law firm in that city, and after private consultation with Mr. Goodwin, the leading member of the firm, he left, on his return home. He returned, a day or two thereafter, as before, unattended, signed the paper, calling on Mr. Davis to witness it as his will, in conjunction with Mr. Goodwin. He was then, and had been for thirty years and more prior to that time, in fine physical and mental health, was in the full possession of all his faculties, fully competent to make a will. This will was not made when the testator was sick or *in extremis*, but at a period when the strength of his mind was equal to the purpose to which it was then applied. This is not, and can not be, disputed.

But it is said, the disposition of the property is so unjust, as to inspire a conviction it was the product of undue influence, and that the devises therein are so contrary to his

previously expressed determination in that regard, as to justify such conviction. Is this so? Who, better than a father, laboring under no delusion, can' appreciate the deserts of a child? Who can control such an one in the testamentary disposition of his property?

This court has said. it is not uncommon that a father, in disposing of his property, is quite apt to lean in favor of those around him, and in hourly and daily communication with him. His right to be so influenced none can question, and his caprices, no matter how apparently unjust, if they do not amount to insane delusion. and are not the result of undue influence, courts can not disturb. *Carmichael* v. *Reed,* 45 Ill. 108.

In *Uhlich* v. *Muhlke,* 61 ib. 499, it was said, that, children have no legal claim to property of living parents ; that all parents have a right to judge who are the proper objects of their bounty, and, if free from insane delusion or *senile dementia,* may give their property to aliens to their blood.

In *Heuser* v. *Harris,* 42 ib. 425, it was held, that, ever since the introduction of the practice of making wills. it has been universally conceded that the testator may dispose of his property by will as he pleases, and that a child has no natural right to the estate of his father.

To the same effect is *Clearwater* v. *Kimler,* 43 ib. 272, which turned upon the execution of a deed, it being alleged no consideration had been paid, the grantees being his son-in-law and daughter. The grantor having made them the recipients of his bounty, the other children had no right to complain.

How natural and how common it is for a father, in disposing of his property, to leave to the child who has been with him in his decline, and a member of his household—the sunshine of his home—and who, married to a man highly appreciated by the father, is rearing a family of her own, under his own eye, and who have nothing but such as he may give them—the largest share of his estate. The elder, in this case,

had been absent from the home circle more than thirty years—had united in marriage with a gentleman, possessed of a competent fortune, and whose wants were all supplied. Is it not natural the father, under such circumstances, should give to the youngest a greater share of his estate? And who has the right to question such a disposition of it? The charge, there was a want of mental capacity, or undue influence used, is a mere pretense, not sustained by any single fact or combination of facts in the case. That the testator. in 1845 and 1849, expressed an equal fondness for his children, and said he should make them equal, or, if he made no will, the law would do so, amounts to nothing. Suppose the deceased had, in either of these years, or at any time previous to the third of May, 1866, made a will according to those declarations. by which all his children were placed on equal grounds, would that prevent him from revoking the will, for any cause deemed by him sufficient? His declarations can have no more force than a will actually executed, the power to change which can not be denied. His youngest daughter did not marry until 1854, and on that event a new horizon was opened to his view. New hopes, new objects, were created, such as influence every man in making a testamentary disposition of his property. No one can allege, with any semblance of truth, that the dispositions made by this will are so unjust as to force the conviction of *senile dementia*, or delusion, in the testator.

Appellee was well provided for. Charles Warren received as much as he would have been entitled to under the statute. The other children of Mrs. Warren were absent, in the south, and do not seem to have possessed the confidence of the testator. It is apparent that, without improper influence being charged, he left his property as most sensible men would have left it, under the same circumstances; but, whether or not, the testator, being, on the third of May, 1866, of good and sufficient disposing mind and memory, and under no undue influence, had the clear right to dispose of his property

27—77TH ILL.

by will, as in his judgment seemed right, and no court or jury can change its destiny.  *Heuser* v. *Harris, supra.*

Giving to the evidence of the *experts* all the weight it can fairly claim, it is so completely overshadowed by the testimony of more than sixty practical, observing, sensible men, near neighbors, and familiar acquaintances of the testator, and so opposed to science and our own observation, that we can not hesitate a moment in giving to the latter a great preponderance.  In testing a will, it is only necessary to produce a few "experts," to give their understanding of mental capacity to a jury, and who may be incapable of diagnosing diseases of the brain, and let it be supposed by the jury that injustice has been done by the testator—that he has not made "a fair divide"—the beneficiaries have but little chance.

In cases like this, all experience teaches us that juries will not be slow to set aside a will, if it does not comport with their ideas of right and justice, and therefore is there an ever pressing necessity that they should be properly instructed as to the law of the case, and no improper or irrelevant testimony allowed to go to them, tending to draw their attention from the true issues in the case.

Appellants complain that certain instructions asked by them were refused.  We will not particularize, but we are satisfied some of them, and the most important, were embraced in other instructions given for them, and others presented propositions of law which, correct in themselves, the court might refuse to give without the imputation of error.  But giving or withholding them, when we look at the instructions given for appellants, could have been of no benefit or harm.

Complaint is made that the court misdirected the jury for appellees.  Of this we are satisfied.  In cases like this, a court can not be too careful in giving instructions.  Here, the only questions for the jury were:  *First,* Was the testator, at the time the will bears date, of such mental capacity to attend to the ordinary affairs of life.  *Second,* Was the will procured by the undue influence of Reuben C. Rutherford;

for this is the charge in the bill.   The testimony was mainly directed to these points.

The court gave to the jury this instruction :   " If the jury believe, from the evidence, that the said John P. Robbins, long prior to May 3, 1866, entertained a settled and long cherished purpose to divide his property equally among his heirs at law, and if the jury further believe, from the evidence, that such instrument in writing, dated May 3, 1866, read in evidence, and claimed by the defendants, Reuben C. Rutherford and Rebecca Maria Rutherford, to be the said Robbins' last will and testament, was not in accordance with such previous intention of the said Robbins, that these facts should be taken into consideration by the jury in determining whether such instrument in writing was the will of the said Robbins, and also in determining whether the said Robbins was of sound mind and memory at the time of the execution of said instrument."

The objections to this instruction are so obvious as scarcely to need mention.   In the first place, there is no evidence on which to base it, in the latitude of its expression.   No witness proved the testator had "entertained a settled and long cherished purpose to divide his property equally among his heirs at law."   All the evidence tending in that direction is, the testator's answer to George Arrowsmith and one other, when talking about the cholera, in 1849, and about John Sharp making his will ; Robbins replied, " Sharp had no children, but he had, and he loved them all alike ; and that the law made a good enough will for him."

This falls far short of proof of entertaining a settled and long cherished purpose to divide his property equally, or any fixed purpose whatever, and should not have been given. But it was wrong so to tell the jury, or to permit evidence of that character to go to the jury against the objections of proponents, for a previous intention to dispose of property in a particular way, no matter how fixed, is wholly immaterial. A person has been known to change the draft of his will

many times; revoke a will; alter it in many particulars; it is wholly in his power, and he is not concluded by anything he may have done or said prior to the execution of the will sought to be established. It does not matter, so all the authorities hold, what a testator may have said or done, anterior to making his last will, as to his intention to dispose of his property. If he had made a will in 1849, executed in due form, giving his property according to our rule of descents, in a case of intestacy, no one will contend for a moment that he became trammeled thereby, and could not make a different disposition of his property. The proposition is absurd.

Nor was the jury to be told, as in the last branch of the instruction, if the will propounded was not in accordance with these previously expressed declarations, they should consider them, in order to determine if the writing presented was the last will of Robbins, and also, for the purpose of determining the soundness of his mind and memory when he made the will.

These propositions are more objectionable than the other. It was not a subject of consideration for the jury at all, for every man has an undoubted right to change his mind in regard to almost all matters, and especially as to the disposition of his property. A marriage or a death in the family may cause a necessity for a change. Various circumstances may conspire to change a preconceived intention of a testator; · and this instruction tells the jury, if we understand it, that such a change is a mark of want of soundness of mind and memory, or of undue influence, which is not so understood. This instruction should not have been given. The ninth instruction, in the modified terms in which it appears, should not have been given, for the declarations made by the testator twenty-years before he made his will have nothing to do with making the will, nor does it tend to prove undue or other influence.

It was equally erroneous to give the fifteenth instruction for appellees. Besides being well calculated to mislead the

jury, it is open to the objections urged to the eighth and ninth instructions, and embraces elements not recognized by any rules of law applicable to such cases.  It is as follows:

"That, in determining the question as to whether said alleged will was or was not procured to be executed by means of undue influence exercised over the said Robbins, at the time of the execution of the same, as alleged in complainants' bill, it is the right and duty of the jury to consider all the evidence before them, as to the time and circumstances under which the same was made; the age and mental condition (as to strength or enfeeblement) of said Robbins; the relations, at the time, of said Reuben C. and Rebecca M. Rutherford to said Robbins; the feelings entertained by said Robbins toward all those persons naturally entitled to his affection and bounty; the declarations previously made by said Robbins as to his intention and purpose in regard to the final distribution of his property; the character of the provisions of the alleged will. as to equity or inequity among the devisees therein, and all the facts and circumstances in evidence in this case."

What have the jury to do with "the equity or inequity" of a testamentary disposition of property, made by one of sound mind and memory, and of sufficient mental capacity? This court and all respectable courts have held that a proprietor may devise his property to whomsoever he pleases, if he be, at the time of making a will, of sufficient mental capacity to transact ordinary business, and to manage the ordinary affairs of life; and making a will is of no higher order.  The authorities heretofore referred to are full on this head.  "The equity or inequity" of devises by a competent testator is not a subject of inquiry by a jury, unless it may be on the point of undue influence, and on that it can have but little, if any, weight, all proof being wanting of undue influence being exercised to procure this "inequity."  The jury are, in effect, told, as the principal beneficiaries under

this will, being the daughter and son-in-law of testator, and living with him in his family as members thereof, opportunities were afforded them of exerting an influence over the testator by which he was induced to change his mind, as previously expressed, in regard to the disposal of his property, *ergo*, they did exercise an undue influence over him by which they were inequitably preferred to his other children; and the jury shall so find.

We hold, as there was a total want of evidence of undue influence at the time of executing this will, or at any other time, exerted over the testator, in any manner or form, the inequality of his testamentary disposition can not be urged as proof of undue influence. If this was not so, no will ever made could stand, if a supposed "inequity" exists in its various devises. The instruction was well calculated to draw the attention of the jury from the true issues in the case. Had the testator mental capacity sufficient to make a will? Was the proposed will made by the undue influence of Reuben C. Rutherford? These were the only issues, and the mere fact that the principal beneficiaries were a part of the testator's family, is no evidence whatever they used any influence to cause the will to be made in their favor.

It was held, in *Brownfield* v. *Brownfield, supra,* that evidence showing that the testator, in his ordinary affairs, acted under the advice of the devisee, and was influenced by that advice, is not sufficient to establish the claim that he used undue influence in procuring the execution of the will. The instruction should not have been given. When we consider the very different ideas entertained by different men, of equity and justice in the various transactions of life, and the more especially in testamentary disposition of a large estate, how prone men are to question the justice of the latter, and how common the sentiment is, that children of the same parents should "share and share" alike, it is quite easy to get the condemnation of the jury upon a will making an unequal disposition of the property. There is no authority for saying

"the equity or inequity" of the testamentary disposition shall be evidence of undue influence, or is a fit element for the consideration of a jury.

Courts can not be too careful in such cases, in permitting evidence irrelevant and improper to go to the jury.

The instructions on which we have commented, substantially tell the jury that, if the testator, years before the marriage of his daughter with Dr. Rutherford, had declared his intention to devise his property equally between his children, and, after the marriage, had changed his mind, and devised the largest portion of it to Mrs. Rutherford, such disposition was inequitable, and the jury may find that such change and such disposition were brought about by the undue influence of Reuben C. Rutherford.    This they are told, in effect, when not a scintilla of evidence is produced that appellants had, at any time, a knowledge a will was to be made, or that it was, in fact, made, or any artifice, contrivance or design of these parties, or by their instigation, to induce the testator to make a will.    The influence their position gave them, as members of the family of the testator, and much beloved by him, was a legitimate influence, and no court or jury have a right to arraign a testator of mental capacity for the inequality of his devises.

But what is the proof of undue influence on the part of Reuben C. Rutherford, for that is the issue? Absolutely nothing.    Not a single fact or circumstance, save domestic relations, has been shown in evidence to establish it.

There is a general concurrence in the testimony that, up to 1869, three years after making the will, the testator was of sound mind and fine physical health; that up to this time he never manifested any signs of mental or physical debility, no defect of mind, memory or comprehension; was very intellectual; well read; had great power of discrimination; in general intelligence, far exceeding ordinary men; of a strong mind, with very great strength of will; when he made up

his mind, was firm, persistent and immovable, against all opposition.

To say that John P. Robbins was not of sufficient capacity to make the will in question, or was influenced, unduly, by others, to make a will not his own, is saying what this record does not show. Who, in Quincy, up to 1869, would have had the temerity to intimate, even, that John P. Robbins was not of sound mind? Would Dr. Bassett have so reported? Who could, then, have been found who entertained the notion that he could be unduly influenced by anybody? Not one, save, perhaps, the appellees in this case.

John P. Robbins was a marked and noted man among the citizens of Quincy, near which he lived for a third of a century, and his large circle of acquaintances, without a single exception, men of sense, observation and judgment, all testify he was a man of strong mind and will, up to 1869, and it is proved that the attack of paralysis in that year did not wholly incapacitate him. No living man, save Dr. Bassett, questions his mental capacity, and his testimony, as we have shown, is not satisfactory or conclusive. In such a case, the testimony of a man claiming to be an "expert," is worth but little when placed alongside the testimony of more than sixty witnesses who knew the testator intimately, and far longer or better than the doctor did, and who have no theories to support.

The verdict of the jury is clearly against the evidence. Valuable property, honestly devised, should not be lost to the devisee on such testimony as this record affords.

In reviewing the whole case, and the judgment rendered therein, we can not but regard it as another illustration of the proposition, that there is nothing so absurd in *fact,* but that it can be supported by some amount of evidence, and nothing so perverse in *law,* but that it can be maintained with some show of authority.

We are satisfied the great preponderance of the evidence is against this verdict, and that the court misdirected the jury to the prejudice of appellants.

For the reasons given, the verdict must be set aside, the decree reversed, and, by direction of a majority of the court, the cause remanded for further proceedings consistent with this opinion.

*Decree reversed.*

Mr. CHIEF JUSTICE WALKER: I concur in holding that instructions eighth and fifteenth, given for appellees, are erroneous, and for that reason the decree should be reversed, but I express no opinion on the weight of the evidence.

Mr. JUSTICE CRAIG, dissenting.

Separate opinion by JUSTICES SCOTT, MCALLISTER and SCHOLFIELD:

We concur in reversing the decree of the court below, for these reasons:

1st. The 8th instruction, given at the instance of appellees, is objectionable in singling out, and thereby giving undue prominence to, particular portions of the evidence.

2d. Appellees' 15th instruction is obnoxious to the same objection as the 8th; and also to the further objection, that it authorizes the jury to take into consideration the equitable or inequitable character of the provisions of the will, as a test of mental capacity,—thus, to some extent, making them the judges of the law, as well as of the facts.

3d. The evidence fails to sufficiently satisfy us that the testator, *at the time* he made the will in controversy, was of unsound mind and memory, within the legal meaning of those words, or that he acted under undue influence, as is charged.

Inasmuch as the case must go before another jury, we deem it unnecessary to express any further opinion upon the questions discussed in argument by the respective counsel.