EDWARD F. WOODMAN *et al.*

*v.*

THE ILLINOIS TRUST AND SAVINGS BANK, Exr. *et al.*

*Opinion filed October 24, 1904.*

1. TRIAL—*motion to direct a verdict does not require weighing the evidence.* On a motion to direct a verdict the real question is whether there is any evidence tending to support the material allegations of the declaration, and not whether, upon weighing the evidence, a verdict against the party making the motion would have to be set aside. (Language in *Simmons* v. *Chicago and Tomah Railroad Co.* 110 Ill. 340, criticised.)

2. SAME—*rule as to directing verdict in suit at law applies to will contest.* In a proceeding in equity to contest a will upon the ground of undue influence or lack of testamentary capacity the same rule regarding directing a verdict applies as in a suit at law.

3. WILLS—*old age and physical infirmity are not evidence of a want of testamentary capacity.* To sustain a charge of want of sufficient mental capacity to make a will, something more than physical suffering, disease and old age must be shown.

4. SAME—*anxiety to have a will made is not undue influence.* Undue influence on the part of certain beneficiaries under the will is not established by proof that they were anxious to have the testator make a will of some kind in the expectation of being beneficiaries, there being no proof of any attempt to influence the testator to make any particular disposition of his property.

WRIT OF ERROR to the Circuit Court of Cook county; the Hon. MURRAY F. TULEY, Judge, presiding.

HOLZHEIMER & CAHN, and RITSHER, MONTGOMERY & HART, (Z. HOFHEIMER, of counsel,) for plaintiffs in error.

PECKHAM, SMITH, PACKARD & AP MADOC, ELA, GROVER & GRAVES, and JOSEPH W. HINER, (ARTHUR W. UNDERWOOD, of counsel,) for defendants in error.

Mr. JUSTICE WILKIN delivered the opinion of the court:

This is a writ of error to the circuit court of Cook county to reverse a decree of that court dismissing a bill by plaintiffs in error against defendants in error to contest the last will and testament of James F. Woodman, deceased. The bill alleged that at the time of the execution of said will the testator was of unsound mind and memory and incapable of executing the instrument, and that he was unduly influenced in the execution of the same by certain of the defendants, John H. Woodman, Gordon O. Woodman, Frances E. Dunlevie and Agnes Craig being the principal beneficiaries therein. These and other parties, together with the executor, were made defendants, and they answered denying the allegations of the bill. An issue at law was made up as provided by the statute, and submitted to a jury, whether the writing produced was the will of the testator or not. The defendants introduced in evidence the certificate of the oath of the witnesses at the time of the probate of the will, and both parties offered oral evidence in support of and against the allegations of the bill. At the close of all the testimony, the trial court, on the motion of the defendants, instructed the jury that their verdict should be "that the instrument is the last will and testament of James F. Woodman, deceased," and a verdict being returned in obedience to that instruction, the bill was dismissed at the complainants' cost.

The only ground of reversal urged in this court is, that the court below erred in giving the peremptory instruction to find for the proponents of the will. Counsel for the re-

spective parties do not disagree as to the fact that the same
rule must be applied on that subject in this case as obtains
upon trials in suits at law, and we have expressly so decided.
(*Thompson* v. *Bennett,* 194 Ill. 57; *Purdy* v. *Hall,* 134 id.
298.)    Notwithstanding the many decisions of this court
defining that rule, it seems to be understood by counsel for
the defendants in error that the court may properly take a
case from the jury whenever it would feel compelled, upon
weighing the evidence, to set the verdict aside if returned
contrary to the views of the court.    The correct rule is suc-
cinctly stated in *Frazer* v. *Howe,* 106 Ill. 563, as follows
(p. 574) : "It is not within the province of the judge, on
such a motion, [a motion to withdraw a case from the jury,]
to weigh the evidence and ascertain where the preponderance
is.    This function is limited strictly to determining whether
there is or is not evidence legally tending to prove the fact
affirmed,—*i. e.,* evidence from which, if credited, it may
reasonably be inferred, in legal contemplation, the fact af-
firmed exists, laying entirely out of view the effect of all
modifying or countervailing evidence."    This rule has been
adhered to throughout the many subsequent decisions of this
court, and while expressions may be found in opinions, as
in *Simmons* v. *Chicago and Tomah Railroad Co.* 110 Ill.
340, where it is said that "when the evidence given at the
trial, with all inferences that the jury could justifiably draw
from it, is so insufficient to support a verdict for the plaintiff
that such a verdict, if returned, must be set aside, the court
is not bound to submit the case to the jury but may direct
a verdict for the defendant," capable of being understood as
authorizing the court to withdraw a case from the jury, if,
upon a consideration of all the evidence, it is convinced that
a new trial would necessarily have to be granted if a verdict
should be returned against the party asking the instruction,
the expression in the case cited was used in repudiation of
what is known as the "scintilla rule," and the correct rule
would have been better stated without the expression, "that
such a verdict, if returned, must be set aside."    Of course,

if convinced that a verdict will have to be set aside because the evidence, with all its reasonable inferences and intendments, does not fairly tend to support it, the court ought to instruct the jury not to return it or to find the other way. But the real question in every such case is not whether a new trial will have to be granted or not, but whether there is any evidence on the part of the plaintiff or defendant tending to support each and every material allegation of the declaration or plea. We have always held that the question whether the trial court properly instructed the jury to find for the plaintiff or defendant is one of law, reviewable in this court, and this manifestly could not be true if the ruling of the trial court in any sense depended upon its determination of the weight of the evidence; and we said in *Rack* v. *Chicago City Railway Co.* 173 Ill. 289: "We have nothing to do with any question as to the preponderance of the evidence, or the credibility of the witnesses, or the force to be given to the evidence having ·a tendency merely to impeach the veracity of the witnesses. The only question is whether any evidence was given which, if true, would have tended to support a verdict for the plaintiff." And, again, in *Chicago City Railway Co.* v. *Martensen,* 198 Ill. 511: "If, as contended by counsel for appellant, the trial court may, at the close of all the evidence, take a case from the jury merely because he regards the clear preponderance of the evidence or the overwhelming preponderance of the evidence as being in favor of the defendant, then the right of trial by jury is left to the judgment and discretion of the court; and no one would seriously insist upon such a rule."

The extended argument of counsel for defendants in error upon the facts of the case as shown by the testimony of witnesses introduced by them cannot aid in the decision of the question here to be determined. Is there any evidence in this record which, with all reasonable inferences and intendments to be drawn therefrom, fairly tends to prove that the testator was not, at the time of the execution of the will in question, of sound mind and memory, and is there any such

testimony fairly tending to prove that he was at that time unduly influenced to execute that will? These are the material and only questions presented for our consideration and decision upon this appeal.

The undisputed evidence in the case shows that prior to November, 1891, James F. Woodman, the testator, being a widower without children, had resided at Salt Lake City, Utah, where he was engaged in the mining business. He left there about that time and came to the city of Chicago, where he took up his abode at the Grand Pacific Hotel. He was then about seventy-eight years of age and afflicted with a complication of diseases,—dropsy, diabetes, arterial sclerosis and Bright's disease of the kidneys. The latter part of the same month he was, by direction of his attending physician, removed to the residence of John Craig and Agnes Craig, his wife, she and her two children being beneficiaries under the will. He was there attended by a professional nurse,—Miss Schermerhorn regularly, and occasionally by Mrs. Anna Cook,—until his death. His attending physician was Dr. Harsha, who visited him regularly and very frequently during the months of January, February and to the 15th of March. The dropsical affliction resulted in an accumulation of water in the chest, oppressing the lungs, and frequent operations became necessary, by way of tapping, to relieve that condition. While counsel for the respective parties seem to differ widely as to the extent of his diseased condition and suffering, we think the proof clearly shows that he was sorely afflicted with these several diseases, suffering great pain and gradually becoming physically enfeebled. Several times during his stay at the Craig residence his condition became so alarming that consulting physicians were called in. About the 14th of January Dr. Harsha says his condition was so low that he expected him to die any moment. A lawyer was sent for after a consultation, he says, "with someone in the household." He then told the testator that it looked as though he might not last long, and advised him if he had any business to transact or affairs to settle up

he had better do it, and a will was prepared by the attorney sent for, signed by the testator and witnessed by the doctor and nurse. The same instrument was re-executed the following day at the instance of the lawyer who wrote it, because of mis-spelled words and informal expressions. Again on the twenty-second of that month a third will was prepared by the same attorney, but Mr. Arthur W. Underwood, who had been consulted about the matter, was present at its execution. It was also witnessed by the same parties. Those present at the time, besides the witnesses, were Craig and wife and John H. Woodman. The reason for the execution of this third will seems to have been that the testator had improved in his physical condition. The three wills were substantially the same. Finally, on the evening of March 14 the one in question was executed. It disposes of an estate estimated to be of about the value of $500,000, consisting of real estate in the State of Utah, bonds of the Salt Lake City Railway Company, mining property at Bingham, Salt Lake county, Utah, city property in Chicago, mining stock in the Silver King Mining Company, Park City, Utah, and money. The will consists of twenty-two paragraphs, and makes twenty devises and legacies to his twenty-five living heirs and to his wife's relatives and the children of his nephews and nieces, including small gifts to these contestants, the larger and more substantial bequests being to the defendants John H. Woodman, Gordon O. Woodman, Frances E. Dunlevie and Agnes Craig. Though somewhat lengthy, it is not complicated or difficult of comprehension. It was prepared by Arthur W. Underwood, Esq., who was present at its execution and detailed the circumstances of its being signed, as follows:

"I saw Mr. Woodman probably four or five times between January 22 and March 12. We talked about the Chamberlain matter and the state of his health, the weather, his going riding, (he thought he was going to get better shortly,) and we discussed the time when he should go on and complete the will and the changes in the form of the will

that were suggested. That was discussed several times and always postponed by him. He said he was going to be better—wanted to put it off. I saw him once or twice in the front room; on other occasions in the bed-room which he occupied, usually sitting up. I don't remember that I saw him move, only as he stood up to shake hands with me. I don't recollect any other move. When in the bed-room he was sitting on a bed or chair or on a couch.   *   *   *   On the evening of March 12 I arrived at the house about six or seven in the evening. I think Dr. Harsha was there. Mrs. Dunlevie, Mr. and Mrs. Craig and Miss Schermerhorn, the nurse, were there. We had come by appointment. I told Dr. Harsha that I thought the matter ought to be arranged, as he had told me from time to time that Mr. Woodman was not improving in health. I said to Dr. Harsha I thought the will ought to be signed if it was going to be made in accordance with the changes we had talked about. I said to Dr. Harsha (I don't know just how long after we arrived) that I thought he had better go in and talk to Mr. Woodman about it. I think Dr. Harsha went in first, and we had a little talk with Mr. Woodman. I suggested that I had the will there which had been drawn according to our previous talks, and asked him what he thought about going ahead with it. Dr. Harsha also suggested something of the same sort—said he thought it had better be closed up. I guess I said should they call the witnesses in. Then I said, 'Shall I read?' Mr. Woodman said yes, and I read the will slowly and discussed it as we went along, a little bit. I stood near him—quite close to him. When I finished reading the will I asked him if he would hear it again. He said he would, and I read it through again. I then produced a document which I had—a summary of the contents of the will.   *   *   *   When I read it I asked him if we should proceed to the execution. I don't know whether he said yes or nodded. He indicated in some way that he was prepared to go on. Ink was brought from somewhere not in the room and he proceeded to try to sign it. He started to write his

name, and either Mrs. Craig or Miss Schermerhorn, who were sitting at his side, called his attention to the fact that it was not on the line, and he started again.  He then said the signature was not a very good one—he was going to try it again; so he tried it again, and I suggested a scroll be made opposite the signature where there was no word written, and I put it in there, also at my suggestion he placed his initial on each page of the will.  The signing of the name was done before he put his initials on the pages.  He tried to sign his name three times.  After that I asked him who he would have for witnesses.  He either pointed to the people or named them—I can't say which.  I think I asked him if he would have Mrs. Cook, and he nodded, and thereupon we all signed in his presence and in the presence of each other."

William M. Harsha, Carrie C. Schermerhorn, Mrs. Anna Cook and Arthur W. Underwood signed as witnesses.  The original instrument being presented for our inspection, the signature of the testator is scarcely legible, and indicates that he was in a very feeble state of bodily health.  There is no dispute, however, as to the fact that he signed it, or tried to do so, as his will.

We have been unable to find the slightest direct testimony tending to prove that the testator was, at the time of the execution of any of the four instruments, lacking in mental testamentary capacity.  It is not claimed that any of the parties present at the several times of their execution so testified.  The only witness introduced by the contestants for the purpose of proving unsoundness of mind was Dr. Julius C. Hogue, a physician and surgeon residing in the city of Chicago.  He had never seen the testator, and the purpose of counsel was to obtain his opinion upon a hypothetical case. He does not pretend to state that a person in the condition of James F. Woodman would, in his opinion, be in any degree of unsound mind.  In fact, his testimony is wholly indefinite on that subject, and cannot be claimed to tend to prove that James F. Woodman was, at the time, of unsound mind, nor is it so contended by counsel for the contestants.  It seems

clear that the complainants below are driven to the position that because of his old age, complication of diseases and enfeebled bodily condition the inference of mental incapacity must be indulged. While it is true that the mind and body are so in sympathy with each other that one cannot be seriously diseased without affecting the other, still, it has been repeatedly held by this and other courts, and laid down generally by text writers, that physical conditions such as the testator in this case is shown to have been afflicted with are not evidence of a want of mental capacity to make a will. In *VanAlst* v. *Hunter,* 5 Johns. Ch. 148, chancellor Kent said: "The testator was between ninety and one hundred years of age when he made his will, but it is well understood that age alone will not disqualify a person from making a will provided he has a competent possession of his mental faculties. 'A man may freely make his testament how old soever he may be, for it is not the integrity of the body, but of the mind, that is requisite in testaments.' * * * (Swind, pt. 2, sec. 5.) The law looks only to the competency of the understanding, and neither age, nor sickness, nor extreme distress, nor debility of body, will affect the capacity to make a will if sufficient intelligence remains." That language was quoted with approval by this court in *Rutherford* v. *Morris,* 77 Ill. 397, and *Pooler* v. *Cristman,* 145 id. 405. Many later cases recognize the same doctrine. No authority has been cited to sustain the position that unsoundness of mind may be inferred from proof of old age or physical disability, and none, we think, can be found. In other words, to sustain the allegations of want of mental testamentary capacity something more must be shown than mere physical suffering, disease and old age, and such proof is wanting in this record.

On the other branch of the case, the evidence fails to show any affirmative act on the part of the defendants charged with unduly influencing the execution of the will, calculated to influence the testator to make the disposition of his property which he did make. The testimony relied

upon by contestants on this branch of the case is that of Mrs. Anna Christian and Miss Florence Woodman, the latter one of the complainants. The evidence of the former tends to prove that John H. Woodman and John Craig were both anxious to have the deceased execute a will of some kind before he died. She testified that she was employed in the office of John Craig as a stenographer, and was directed by him that in case any telegrams were received from John H. Woodman, under no circumstances to allow Miss Florence Woodman, who was also employed in the office, to know their contents, and to acquaint him with the fact at the first possible chance; that two telegrams were received from John H. Woodman, addressed to John Craig, by her, one of which stated, "Have the doctor advise uncle to make his will;" another, "Under all circumstances see that uncle makes his will at once; if I am needed, wire me and I will come immediately." She also testified that in connection with the receipt of these telegrams and their delivery to John Craig he said, "Harry [John H. Woodman] and I understand each other;" also, that he, Craig, requested the witness to use her influence to prevent Florence Woodman from visiting her uncle, giving as a reason that he was disappointed in the girl and was going to have her father write for her to come back home.

While this and other testimony is to the effect that at least John H. Woodman and John Craig were anxious that the testator should make his will, there is nothing in the testimony even remotely tending to show that they attempted in any way to influence him to make any particular disposition of his property. The receipt of the telegrams and the conversations testified to were some weeks, if not months, prior to the making of the first will. The testimony of Miss Florence Woodman is simply to the effect that John H. Woodman, or Harry, as he was called, and the Craigs, endeavored to influence her uncle not to allow her to visit him; but her evidence is very indefinite on that subject, and it seems that she did call upon him, from time to time, at the

residence of the Craigs. We have frequently held that "the influence to avoid a will must be such as to destroy the freedom of the testator's will, and thus render his act obviously more the offspring of the will of others than of his own; that it must be an influence specially directed toward the object of procuring a will in favor of particular parties, and if any degree of free agency or capacity remained in the testator, so that when left to himself he was capable of making a will, then the influence which so controls as to render his making a will of no effect must be such as was intended to mislead him to the extent of making a will essentially contrary to his duty, and it must have proved successful to some extent, certainly." (*Roe* v. *Taylor,* 45 Ill. 485; *Allmon* v. *Pigg,* 82 id. 149; *Thompson* v. *Bennett, supra,* and authorities cited.) Here there is no testimony whatever tending to show that either of the parties charged with having unduly influenced the making of the will said or did anything whatever at the time of the execution of it, in any way calculated to influence the testator to make any of the devises or bequests therein mentioned. The most that can be said, in any view of the testimony, is, that they were anxious that he should make a will of some kind, no doubt expecting to be beneficiaries.

Accepting the foregoing rule as to the undue influence which will avoid a will as the correct one, we are unable to see how it can be seriously contended that the evidence in this record, with all the inferences or intendments that can be reasonably drawn therefrom, tends in any way to bring this case within its requirements.

We are satisfied from a thorough consideration of the evidence in this case that the trial court was legally warranted in taking the case from the jury, not on the ground that he would have felt compelled to set aside a verdict in favor of the complainants, but because there was no competent evidence fairly tending to prove the allegations of the bill. Its decree will accordingly be affirmed.

*Decree affirmed.*