### Cicero & Proviso Street Railway Company v. Allen V. Hughes, by next friend.

#### Gen. No. 12,124.

1. VERDICT—*when set aside as against preponderance of evidence.* Where the Appellate Court from a careful examination of all the testimony is convinced that the verdict is clearly and manifestly against the weight of the evidence, it will set aside such verdict and reverse the judgment.

2.  Peremptory instruction—*when denial of motion for, proper, notwithstanding verdict if rendered against the party making such motion would be against the preponderance of the evidence.* The denial of a motion for a peremptory instruction is proper notwithstanding a verdict if rendered would be against the preponderance of the evidence and would therefore have to be set aside upon a motion by the party so asking for a peremptory instruction.

Action on the case for personal injuries. Appeal from the Superior Court of Cook County; the Hon. Arthur H. Chetlain, Judge, presiding. Heard in this court at the October term, 1904. Reversed and remanded. Opinion filed December 4, 1905.

John A. Rose, Albert M. Cross, and Henry W. Brant, for appellant; W. W. Gurley, of counsel.

John F. Waters and C. Helmer Johnson, for appellee.

Mr. Justice Ball delivered the opinion of the court.

Appellant operated a single track electric street railway in St. Charles avenue, an east and west highway in the village of Maywood, Illinois. This track when it reaches 19th avenue, a north and south paved street in the same village, turns by a curve to the south until it unites with and ends in a single track, also operated by appellant, lying in the last named avenue. A car going west in St. Charles avenue is run around the curve and is stopped when it has cleared the curve and is wholly on the 19th avenue track. The power is then reversed and the car is run north two short blocks to a depot which is the end of the line. The power is then again reversed, and the car proceeds south along a straight track, crossing the curve at St. Charles avenue, to Madison street, where it turns east and goes on into the city of Chicago. The west wheels of the south-bound car do not touch either rail of the curve, but its east wheels cross both of said rails. It is the custom of the motorman going south to slow down to one-half speed in approaching and in passing over this curve.

The plaintiff below recovered a judgment for $4,500 against appellant for injuries he sustained at this curve May 19, 1898, by reason of the alleged •negligence of appellant,

the defendant below, while the plaintiff, as it is alleged, was
a passenger upon one of the defendant's south-bound cars.
At the time of the accident the plaintiff was eight years old
and small of his age, but was a bright, active boy. It ap-
pears that the boy and his grandmother took an east-bound
car at 15th avenue and St. Charles avenue and rode west to
19th avenue and from there north to the end of the line.
The grandmother was on her way to her home in the city
of Chicago, and it is claimed that the boy was going with
her to stay over night. The car was an open one, having
a foot-board on each side, a center aisle, and short seats fac-
ing each other on each side of the aisle.

The grandmother, a woman aged 78 years, testified that
she took a seat on the north side of the car and the boy sat
in front of her; that the car passed west and north to the
depot, and then started south; that she sat facing south with
the boy sitting opposite her, his feet not reaching to the
floor; that when the car reached this intersection or curve,
"it gave a sudden jerk, whatever was the cause of the jerk
I can't tell you, because I would not tell a story. When
the car gave this jerk it was given so quick I can't tell you
what happened to the boy. He fell just like he flew. The
jerk threw him out. That is my opinion about it;" that
the "car was going straight south when this jerk came, and
it picked him up and threw him out from the end of the
seat into the street just like he flew. The first thing he
struck after he left the seat was the street. He did not fall
down on the floor of the car; it simply lifted him up out of
the seat and landed him into the street;" that a man (the
witness Twining) said he would take the boy home, and, as
the two walked away, she went on in the car; that the boy
had never before gone to her home except when accom-
panied by either his father or his mother; and that twice
before the boy had gone with her to the end of the road—
"He would simply ride up to the depot and get off and stay
off and would go home."

The boy testifies that he got on the car with his grand-
mother at 15th avenue and sat opposite to her in the center

of the seat, not holding to either end of the seat, and that he did not change his position until he was thrown off the car. That the car left the station and proceeded south, and "As they went to go over the switch I went off. When the car jerked I fell off and hit the ground and slid a little ways. The car at that time was going about the ordinary rate of speed." That he was thrown off right at the switch. That when the car reached the switch it suddenly started up. "It was both the sudden starting and the wheel going over the switch that threw me off. The wheel on the west side of the car don't go over the switch because there is no switch there. The car started forward with a jerk and then it kind of bumped, the whole car bumped. It did not throw my grandmother out. It did not throw me over against her. The first thing I struck was the pavement. Like a boy would throw a ball, I bounded out of the seat in a north-westerly direction and landed on the pavement,—I fell out of the west side. * * * I never stood on the foot-board at all."

W. L. Twining, a witness called by defendant, testified that he had charge of the office of the Proviso Land Asso-ciation, which office stood on the northwest corner of St. Charles and 19th avenues. That at the time of the accident he was standing at the water fountain near the office, about 20 feet from the roadway looking north at the coming car. That "At a point about 200 feet from St. Charles avenue, on the west side of the car, hanging to the side rails, that is, the uprights of the car, was this boy, and every few feet he would hang on that way and put his foot down to see how fast the car was going, as though he was going to get off, and run a little ways and jump on again. He continued doing so until he got to the line of the south sidewalk of St. Charles avenue, when he jumped off the car backwards, rolled over nearly to the sidewalk—rolled over about twice, I should judge, and began to scream. I promptly ran out, picked the boy up, and asked him if he was hurt." That witness first carried the boy into the office and then led him home. That the car "was running at a fair rate of speed

until it got within the width of the street from the switch, when it slacked up to cross the switch, and when the boy jumped off the car was going at a very slow rate of speed. * * * I didn't notice that there was a sudden starting and jerking of the car at the time the boy stepped off or fell off. I had seen this boy about these cars before this time numberless times. I have sent him home a good many times for jumping on the cars, and spanked him once for jumping and riding on the cars—flipping cars at that corner and riding down to the depot and back." That at the time of the trial the witness was manager of the Proviso Land Association and had about 150 men working under him.

Thomas G. Rhodes, a travelling salesman and a passenger on this car, testified: "This boy that fell off the car at the end of the line was on the car and on the railing, that is, on the foot-board of the car, talking to an old lady there. An old lady was sitting in one of the seats and the boy was on the outside rail hanging on the outside rail—that is, the little railing of the seat, and talking to the old lady. As the car came down to St. Charles road they slacked up to cross over on that crossing. I did not see the boy as he stepped off the car. When I next noticed him after he was off the car he was right on the ground alongside the car. There was nothing unusual about the movements of the car as it came down the street to the south side of St. Charles street. There was nothing in the car that jarred or shook me out of the seat. I noticed the boy all the way down. * * * He was standing right on the board at the end of the seat. I didn't notice him inside the car."

The affidavit of C. I. Barker, an agent of the defendant, was read, to the effect that if W. G. James, who was conductor on the car at the time and place of the alleged accident, were present, he would testify that "As his car was going south on 19th street he noticed the plaintiff standing on the foot-board of the car near an aged lady; that he was not seated in a seat in the car at the time of the accident or at any time shortly prior thereto, but was standing on the

Street Railway Company v. Hughes.

foot-board; that when the car reached a point near St. Charles street the plaintiff jumped from the moving car to the ground and fell and hurt himself; that at the time he jumped from the car said car was going at a slow rate of speed and was running smoothly; that there was no sudden jerking of the car as the same passed over the switch at the intersection of 16th street and 19th street, and that said plaintiff was not thrown out of the car, but jumped from the foot-board to the ground while the car was in motion; that plaintiff had not paid his fare as a passenger and had not taken his seat within the car as a passenger."

H. B. Sherman, the motorman on the car, testified: "I noticed the boy while the car was standing at the depot, and he was around the car, on the running-board and on the car. I didn't notice him after the car started south. As the car came down to St. Charles street and crossed the switch it was running four or five miles an hour. There was no jerking. * * * I didn't see him fall. The last I noticed of him was just about the time the car started. * * * I couldn't say how many times I have seen the boy around the depot and along the tracks there before the accident. I have seen him several times. * * * We always slow down at that switch when we are going south so as to go over the switch slow. I couldn't say that it was rougher there than it is on a smooth track. It is always the company's rule to slow up going over a switch. There is a little unevenness of course in any switch. I suppose there was at this time."

Dr. W. F. Scott, a witness for the plaintiff, testified that he was called to care for the plaintiff, and he went on to describe the injury to the boy's left arm and his treatment of the same. Dr. Scott was afterwards called by the defendant, and then testified: "During the time I treated this boy I had some conversation with him. He told me how this accident happened. He said he got on the street car to ride a piece with his mother, with his grandmother; that she was going away on the car, and that he intended to jump off, which he said he did, and that was the way he had

broken his arm; that he fell in jumping from the car. ·That was during the time I treated him." On cross-examination the witness admitted that his bill had not been paid, and that he felt he had not been treated right about it by plaintiff's father. He further said: "I am not the doctor for the defendant company and never was. * * * I don't remember how long this conversation was after the accident. I think it was during the first examination, because we usually try to get at the exact manner that the patient falls, as it gives us some idea of the kind of injury that we may expect. I don't remember exactly when it occurred."

The control of an appellate tribunal over a verdict which is manifestly against the weight of the evidence is undoubted. This rule was announced in Lowry v. Orr, 1 Gilm., 70, and was followed by our Supreme Court so long as it passed upon the facts of cases coming before it. See Chase v. Debolt, 2 Gilm., 371; Koester v. Esslinger, 44 Ill., 476; I. C. Ry. Co. v. Alexander, 46 Ill., 505; Haycraft v. Davis, 49 Ill., 455; C. R. I. & P. Ry. Co. v. Gregory, 58 Ill., 272; Peaslee v. Glass, 61 Ill., 94; Lincoln v. Stowell, 62 Ill., 84; C. B. & Q. Ry. Co. v. Stumps, 69 Ill., 409; Reynolds v. Lambert, 69 Ill. 495.

The Supreme Court since the organization of this court has further declared that it is the duty of this court to consider the testimony in the case, and if we find that the verdict and judgment are not supported by it, or are clearly against the weight of the evidence, it is then our duty to set aside such verdict and to reverse such judgment, and that a performance of this duty is absolutely essential for the preservation of the rights of citizens and property owners in all those classes of cases where the judgments of this court are final and conclusive upon all questions of fact. C. & A. Ry. Co. v. Heinrich, 157 Ill., 388; C. & E. Ry. Co. v. Meech, 163 Ill., 308; Gall v. Beckstein, 173 Ill., 189.

This court has applied the same rule in many cases, among which are: Dinet v. Reilly, 2 Ill. App., 316; Bernstein v. Patterson, 33 Ill. App., 152; C. C. Ry. Co. v. Delcourt, 33 Ill. App., 432; Goss & Phillips Mfg. Co. v. Suelau, 35

Street Railway Company v. Hughes.

Ill. App., 103; C. & E. I. Ry. Co. v. Gill, 37 Ill. App., 61; C. W. D. Ry. Co. v. Conley, 43 Ill. App., 347; N. C. St. Ry. Co. v. Lotz, 44 Ill. App., 78; Welch v. Huckins, 45 Ill. App., 53; N. C. St. Ry. Co. v. Fitzgibbons, 54 Ill. App., 385; I. C. Ry. Co. v. Kennicott, 68 Ill. App., 90; Elguth v. Grueszka, 75 Ill. App., 281; Jefferson Ice Co. v. Zwicokoski, 78 Ill. App., 646; W. C. St. Ry. Co. v. Lieserowitz, 98 Ill. App., 591; Johnston v. Sochurek, 104 Ill. App. 352.

The conclusion to be drawn from all these cases is, that when this court, from a careful examination of all the testimony, is convinced that the verdict is clearly and manifestly against the weight of the evidence, it becomes our duty to set aside such verdict, and to reverse the judgment entered thereon.

In the case at bar the somewhat improbable statements of the plaintiff and of his grandmother as to the way in which this accident happened are contradicted by the evidence of two employees of the defendant and also by three intelligent disinterested and unimpeached witnesses.

It is not necessary to restate the testimony. It is sufficient for us to say that the great preponderance of the evidence is against the contentions of the plaintiff, and is in favor of those of the defendant.

At the close of the plaintiff's case and again at the conclusion of all the evidence, the defendant moved the court to instruct the jury to find the defendant not guilty. The court denied the motion. This was not error. There was evidence before the jury which, if believed, fairly tended to establish the plaintiff's cause of action. In such case the law is well settled that the facts must be submitted to the jury. Woodman v. Ill. T. & S. Bk., 211 Ill., 578.

The judgment of the Superior Court is reversed and the cause is remanded.

*Reversed and remanded.*