Mary Maloney, Administratrix, v. Illinois Central Railroad Company et al.

Gen. No. 13,057.

1. ASSUMED RISK—*when doctrine of, applies.* A servant cannot recover of his master where he is injured while in the performance of his duties by reason of the manner in which the business of his master was conducted where such manner of conduct was not different from that which had previously prevailed, as to which he was familiar and with respect to which he had made no complaint.

2. INSTRUCTIONS—*when erroneous, will not reverse.* The giving of erroneous instructions will not reverse where it appears as a matter of law that the complaining party was not entitled to a verdict in his favor.

Maloney v. Illinois Central R. R. Co.

Action in case for death caused by alleged wrongful act. Appeal from the Superior Court of Cook County; the Hon. OSCAR E. HEARD, Judge, presiding. Heard in this court at the March term, 1906. Affirmed. Opinion filed March 5, 1907.

Statement by the Court. The appellant, administratrix of the estate of Michael Maloney, deceased, sued the appellees jointly, claiming in her declaration that they, by their negligence, caused the death of her intestate, Michael Maloney. The declaration consists of eight counts, to which each of the defendants pleaded the general issue. We do not think it necessary to refer specifically to the declaration, as no question as to its sufficiency, or variance between it and the evidence, is presented for decision.

At the conclusion of the evidence, the court, on motion of the defendant, the Illinois Central Railroad Company, instructed the jury to find that company not guilty, and refused to grant a like motion by the Central Elevator Company. The jury found the Illinois Central Railroad Company not guilty, as directed, and also found the Central Elevator Company not guilty, and the court, after overruling the plaintiff's motions for a new trial and in arrest of judgment, rendered judgment on the verdict.

The following statement, which is prefixed to the argument of counsel for the railroad company, we have compared with the evidence and find it substantially correct:

"The elevator was located a few feet more than a car length south of the south bank of the Chicago River, and about 300 feet north of South Water street. The building was about 200 feet long from north to south, and 75 to 100 feet wide from east to west. Three railroad tracks extended north from the Illinois Central Railroad yards at South Water street and entered the elevator through separate doors on the south side of the building. The central track was a lead from the yards, and the east and west tracks

branched off of this lead at a switch at South Water street, and after leaving the switch the three tracks were parallel and about fourteen feet apart within the building; the doors were only sufficiently large to clear the sides of a car entering them on the tracks from six to eight inches. Owing to a change in the height of cars in recent years, it became necessary, some years before the accident, to increase the height of the doors, and this was done by lowering the track from South Water street to the entrances, so that within the building the tracks were two or three feet below the regular floor of the elevator. The east track was not used and the doors were kept closed. The central track ended at the north end of the building, and the west track extended through a door on the north side and about a car length north thereof to a butt post provided for stopping the cars. The first floor of the elevator is spoken of by witnesses as platforms between the various tracks, because of the fact that these tracks were below the floor. The distance between the rail and the bottom of the platforms was about three feet, so that a man could not stand between the platform and a car on the rails without being struck. On each side of the tracks, at intervals of about eight feet, wooden steps led from the various platforms to the level of the tracks, and were used for crossing from one track to another. The second floor of the elevator was 80 or 90 feet above the first. Extending down between the second and first floors over the platforms, and on each side of the tracks, were grain bins supported by heavy posts or timbers extending from the platforms to the ceiling. These bins were about ten feet square, and came down to points 12 or 14 feet above the platforms, where there was an opening in the bottom of the bin through which the grain passed out of the bins and into hoppers below the platforms, from whence it was loaded into cars. The opening or mouth of these

bins was opened and closed by pulling on ropes attached thereto. The hoppers under the floor were 20 to 25 feet apart, and each of them was supplied with an apparatus for hoisting the grain, called a receiving leg, which consisted of an endless belt running perpendicularly from the hoppers below the first floor, where the grain was unloaded from the cars, to the second floor, where the tops of the bins were. To this belt buckets were attached for carrying the grain. There were seven of these receiving legs on the west track. Shipping bin 8, which is involved in this case, was on the platform west of the west track, and from 35 to 50 feet south of the north wall of the elevator. Near the center of the house and on the platform between the east and middle tracks were two speaking tubes used to communicate from the first to the second floor. These tubes were 100 feet from shipping bin 8, and to go from the tubes to shipping bin 8 a person could walk straight across the elevator and tracks. With the exception of the timbers, bins and legs, above referred to, the whole of the elevator was entirely open from the first to the second floor, 80 or 90 feet above. In addition to the doors above mentioned, there were on the west side of the elevator, 12 feet from the west rail of the west track, six doors, 3½ feet wide by 7 or 8 feet high, and 12 windows of about the same size. There were no artificial lights in the elevator; there was bright sunshine on the day of the accident, and the natural light was as good as in the court room at the time the case was tried. Cars were switched into and out of the elevator by the Illinois Central Railroad as directed and requested by the Elevator Company, and for the purpose of indicating to the former its desire in this respect, the Elevator Company had placed on the outside of the south end of the building and above each of the doors, over the tracks, signals or semaphores in the shape of an arrow or arm, painted white, and so situated that they could be seen from the yardmas-

ter's office. These arrows were manipulated from the inside by means of a chain or rope. When it was desired to have the cars switched into and out of the house, the employes of the Elevator Company pulled these arrows down so that they were horizontal, and fastened the rope or chain to hold them in that position, and so left them until the crew came and did the work. When the rope was released, the arrows would automatically revert to the perpendicular position. When these signals were in a horizontal position they indicated to the trainmen that the cars had been unloaded, and that the track and place were clear for them to come in and do the switching. When it was desired to block the tracks against the trainmen, the position of the arrows would be perpendicular.

The trainmen never went to the elevator except when the signal was horizontal; that had been the practice during at least eighteen years, and there had been no custom in vogue other than to go in obedience to the signals, nor any custom by which the switching crew would go into the elevator or kick a cut of cars into the house except in accordance therewith. The tracks within the elevator would hold four cars when placed for unloading, and five when coupled together. The regular method of doing the work was, that when the railroad crew, in response to the ordinary signal, brought four loaded cars to be placed on each of the center and west tracks, the car spotter in the employ of the Elevator Company, Raleigh, would go along on the platform opposite the cars and indicate to the trainmen where they were to be placed, and the cars would accordingly be uncoupled and placed or 'spotted' opposite the receiving legs, and when so spotted they would be separated by about ten feet. The elevator employes would then unload the cars, and after unloading them would push them together and re-couple them, after which it was and always had been the custom, known to all the elevator men, that the next movement would be to raise the semaphore

to a horizontal position in order to notify the trainmen to come in and do the switching; and the employes from their experience in the elevator, knew that when the cars were coupled together, the signal was supposed to be up, and the engine was liable to come in at any time. After receiving this signal, which meant that these cars had been unloaded and that the track was clear for more, the engine, attached to the south end of eight loaded cars, would push north into the elevator on the central track, couple onto the four empties standing thereon, pull the twelve cars back south of the switch at South Water street, and again push the train north, throwing the switch so as to divert the four empties onto the west track and against the four empties standing thereon in the elevator, and the engine and eight loads again onto the middle track. Four loaded cars would then be spotted on the middle track. The engine would then be cut off, the eight empties pulled out of the west track, and the remaining four loads spotted there. This was the way the work was always done every day. There would be an average of five such switching movements every day, and it sometimes happened that there would be as many as twenty-five or thirty. It was not the custom for switchmen to accompany cars into the building during these switching movements, and they never did so, for the reason that the space between the side and top of the car and the door was such that the switchmen could not ride the cars into the elevator without lying down on the top of the cars; nor was it possible for such switchmen to walk between the cars and the platform in the elevator. The cars were supplied with automatic couplers, and it was necessary, in order to have the four empties from the middle track couple onto the four on the west track, that they should come together hard enough so that they would work by impact. Many couplings had to be 'jammed' three or four times before they could be made.

Deceased had been in the employ of the Central Ele-

vator Company at this plant for more than thirty years, and was foreman of the main floor in connection with the grain, his duties being to draw the grain from the various bins to the hoppers at the bottom of the legs, send it to the weighman to be weighed and shipped, and to keep the legs mechanically in order. There was no one in the house superior to him except the superintendent, Roberts. The witness Bougher was receiving weighman, and kept tab on what was in the elevator and what its condition was. His post of employment was in the cupola of the building, 100 feet above the ground. It was the duty of these two men to, and they did, co-operate with each other as to what each should do; each accepted suggestions from the other. On the day in question, eight cars which had been unloaded were standing on the middle and west tracks, four cars on each track. After they were unloaded the spotter (Raleigh), together with the men who had been working on the cars, pushed the cars on each track together and coupled them, and Raleigh then placed the semaphores over the west and middle tracks in a horizontal position as a signal to the railroad men. After the cars were coupled the north end of the north car on the west track was thirty feet south of the north door, and from five to fifteen feet north of the mouth of shipping bin eight. There was also a coal car standing on the west track, north of the elevator, its south end being about five feet north of the door, so that between the coal car and the grain cars was a space of about thirty-five feet. Some time between two and three o'clock in the afternoon, Bougher, the weighman, went to the speaking tube at the top of the building and rang the bell below, which was on the platform between the middle and east track. Deceased answered it, and Bougher asked him if he would go over to the west side and open up shipping bin eight, so that he could have it cleaned out, and deceased replied that he would. That was the last

Bougher heard or knew of deceased until after the accident, which he said might have been thirty minutes later. Some time between 2:30 and 3 o'clock (and about thirty minutes after the signal had been raised) a train crew of the Illinois Central Railroad Company, in response to the signal, came to do the switching, and shoved the eight loads down the middle track, and coupled onto the four empties. When the engine appeared at South Water street for the purpose of doing the switching, and for about ten minutes before, deceased stood in conversation with the spotter, Raleigh, at a point on the platform between the east track and the central track, five feet inside of the elevator, near a small door on the south of the building between the middle and east track. Deceased stood there as the eight loaded cars came down the central track, and saw them coupled onto the four empties; the spotter then left the south end and went to the north end of the elevator to be in position to spot the four loaded cars when they should return, and did not thereafter see deceased. The engine pulled the twelve cars south beyond the switch, and threw the four empties onto the west track; about ten minutes elapsed from the time of the movement to start south on the middle track until the empties were pushed onto the west track. In the meantime deceased had gone to the west track, and was seen by a witness 'fixing' one of the bins about ten minutes before he was hurt. He left the bin and was struck on the west track right at the north door, by the most northerly of the four empty cars standing on the west track, which had been forced north when struck by the cars from the central track. These four cars struck the coal car standing to the north of the elevator and shook the grain doors of the empty cars.''

KICKHAM SCANLAN, for appellant.

CALHOUN, LYFORD & SHEEAN (JOHN G. DRENNAN, of

counsel), and WINSTON, PAYNE & STRAWN (JOHN D. BLACK, of counsel), for appellees.

MR. JUSTICE ADAMS delivered the opinion of the court.

The evidence is that the Illinois Central Railroad Company owns the elevator and tracks in question, but that the other defendant, the Central Elevator Company, was in the exclusive possession, control and operation of the elevator at the time of the accident, and that the railroad company did not enter the elevator building with its cars except on invitation of the elevator company, expressed by signal made in the manner shown in the statement preceding this opinion. Therefore, whenever the usual signal to the railroad company, to take loaded cars into the building and empty cars out of it, was given, it had the right to presume that the tracks in the building were clear, and that its cars would be moved into and out of the building with safety to persons in the building. In short, the railroad company had to depend wholly on the elevator company to clear the way for its cars when it was signaled to propel them into the elevator building.

It is averred in the declaration and urged by plaintiff's counsel in argument, that the cars were driven into and through the elevator at a high and dangerous rate of speed. This is attributed by counsel to two causes; a decline in the grade of the west track from the switch leading from the main or lead track into the west track on which the accident occurred, and the force by which the cars were propelled through the switch and on to the west track. It appears from the evidence that some years before the accident larger cars than those formerly used came into use, and that to make room for their passage through the doors of the elevator, the floor was depressed two or three feet where the tracks ran through the building, leaving the lower floor, where not so depressed, as formerly, and that on account of these depressions the grade of the tracks

between the south end of the building and the switch was changed so as to decline somewhat from the switch toward the elevator. The switch was at South Water street, 300 feet south of the south end of the building, so that the depression of the tracks in the elevator being only two or three feet, the decline was certainly not steep. George Lawther, called by the plaintiff, was one of the switching crew, in the employ of the railroad company, at the time of the accident, and he testified that from South Water street to the elevator there was just the slightest depression in the tracks, and that, at the south end of the elevator, the tracks were about level.

Frederick Roberts, superintendent of the elevator company, called by plaintiff, testified: "I do not know the difference in the grade from the entrance to our west track at South Water street, the switch track. I would think from the effort which it takes to move a car in, which we frequently have to do by hand, that the variation from the dead level is almost nothing. It is almost impossible for us, with pinch-bars, to push a car in there, so I take it from that, that it is almost, if not quite a dead level. I never measured it."

The evidence shows, without contradiction, that the switchmen never went into the elevator building to couple on to the empty cars, and there being only six or eight inches of space at the sides and on top, between the cars and the door frame, as the cars pass through, the switchmen could not pass in without lying down on top of the cars, and that, in order to make a coupling with the empties, which had previously been coupled together by the elevator company's employes, it was necessary to use considerable force to make the coupling, which was automatic. Raleigh, an employe of the elevator company, called by plaintiff, testified: "In the making of the couplings inside the elevator, it is necessary that those cars come together enough so that the automatic couplers will work. In order to have the

couplings themselves catch and hold, it is necesasry that the cars come together with some force. A switchman could not walk alongside of the cars, and on these tracks, inside of the elevator. There was no space." In another part of his testimony this witness says: "The only way in which the switchmen could make these couplings then, would be to send one cut of cars down hard enough against the others, so the automatic couplers would work by impact."

Lawther, called by plaintiff, testified: "In sending cars into a track, which you intend shortly afterwards to pull, you have got to hit them hard enough so the jaws come together. Lots of couplings we have had to jam three or four times before we make them." This witness, who had worked for the railroad company, doing work at that elevator, for eighteen years, testified: "There was no difference in the movement on that day from the way in which it was customarily and ordinarily made, nor any difference in the speed in which they were moving."

Counsel for appellant says in his argument that when the empty cars struck the coal car, which stood next the bumper, at the north end of the west track, they rebounded ten feet. This doubtless is urged as evidence that the cars were moved at too great speed. We find no evidence in the record, however, that there was such a rebound. The witness Raleigh testified that he heard the four empties bump against the coal car at the north end. He says nothing of a rebound. We have read in the record the evidence of Louis Donbrowski, called by plaintiff, and find nothing in it of a rebound. The following questions were asked him and answers given in his examination in chief by appellant's counsel:

"Q.  Did the empty cars strike the coal car?
A.  Yes, sir.
Q.  And when they struck the coal car, what happened to the empty cars?
A.  The engine pulled them out.

Q. Did the coming together of the coal car and the empty cars, did the coming together of the cars in there make any noise?

A. No, the engine took them right out."

It is evident that when the empties came in contact with the coal car there was no noise so unusual as to attract the attention of the witness, although, as his evidence shows, he was only a short distance from the coal car. There is no evidence that there was anything broken or damaged when the extreme north, empty car came in contact with the coal car. We are of opinion that there was no evidence fairly tending to prove a case in favor of the appellant against the Illinois Central Railroad Company. The rule, as stated in Offutt v. Columbian Exposition Co., 175 Ill. 472, 474, is that "when the evidence given at the trial, with all inferences that the jury could justifiably draw from it, is so insufficient to support a verdict for the plaintiff that such a verdict, if returned, must be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for the defendant."

In Woodman v. Ill. Tr. & Sav. Bank, 211 Ill. 578, the court says: "Of course, if convinced that a verdict will have to be set aside because the evidence, with all its reasonable inferences and intendments, does not fairly tend to support it, the court ought to instruct the jury not to return it, or to find the other way." We think the evidence as to the Illinois Central Railroad Co. is of the character thus described, and that the court properly instructed the jury to find that company not guilty.

Counsel for appellant asserts that the verdict finding the Central Elevator Company not guilty is contrary to the weight of the evidence, and contends that the company was negligent in directing plaintiff's intestate to open shipping bin 8, after signaling to the switching crew, by means of the semaphores on top of the building; and in failing to notify the deceased of the movement of the cars; and in permitting the

cars to be kicked down the west track at the rate of speed shown by the evidence, and without engine or brakeman.

Frederick C. Roberts, superintendent of the elevator company, but who gave no orders on the day of the accident, testified that Maloney, the deceased, had nothing to do with the loading or unloading of the cars; that his work was to draw the grain from the various bins to the hoppers at the bottom of the legs, and send it to the weighman to be weighed and shipped to the vessels or cars, and to keep the legs mechanically in order, and that there was nobody over him in his work. He also testified that Bougher was the receiving weighman, in charge of the grain in store, who kept tab on it, saw what condition it was in and distributed it among the different bins, selecting the bins in which it should be placed, and that his place to work was in the cupola above the bins, from which place he could not see what was being done on the main floor, below him.

Bougher, called by the plaintiff, testified that he was on the receiving floor of the cupola, probably a hundred feet from the ground, and he wanted a bin opened up, cleaned out, changed from one kind of grain to another, and swept out and in the afternoon, between two and three o'clock, he went to shipping bin 8, on the west side of the elevator, the fifth bin from the corner, which he wanted cleaned out, and went to the bell and rang, and Maloney came to the bell, and he asked him to go over to the west side and open up shipping bin 8, so that he, witness, could have it cleaned out, and he said he would, and he went over and opened the bin, and in about thirty minutes afterward witness heard that Maloney was hurt. The place at which the witness rang the bell which he mentions was at the speaking tubes, which ran up from the platform between the middle and east tracks, and about the center of the building, to the cupola. This communication or request from Bougher to Maloney

is what is referred to as an order. The witness Roberts testified that it was Mr. Bougher's province to tell Maloney when he wanted these bins cleaned or opened, and to tell him to open the mouth of shipping bin 8; that it was Maloney's province to give a like suggestion to Bougher; that it was Bougher's duty to receive the grain in the scales, weigh it and distribute it in the bins, and Maloney's to withdraw it from the bins with the elevator legs and send it back to the scales for delivery, or to be changed to another bin, on account of its condition; that it was their duty and they had to co-operate with each other as to what each should do. Maloney would suggest to the weighman and the weighman to Maloney.

The evidence is that Maloney crossed the west track in going from the platform between the middle and east tracks, where he received Bougher's communication, without injury. Louis Donbrowski, plaintiff's witness, testified: "I was on the north end of the elevator, had been on the north end shoveling cars. I saw Michael Maloney fixing one bin; that is all; more than that I didn't see. I don't know the number of the bin. When he was fixing the bin I was outside. I was going into the house, inside the house, when he was fixing the bin. I was at the coal car. When I was at the coal car, Maloney was in the house. When I was at the coal car Maloney was about five or six feet into the elevator. This was about ten minutes, about ten minutes before Maloney was hurt, when he was fixing the bin."

Donbrowski was the last witness who saw Maloney before the accident. The bins were opened and closed by means of slides at the bottoms, to which ropes were attached, in pulling one of which the bin would open, and by pulling the other it would close, so that a bin could be opened instantaneously.

The plaintiff's intestate was amply notified that the cars might come into the elevator at any time prior to the accident. Raleigh, plaintiff's witness, testified:

"Whenever the cars are coupled together, ready to be hitched onto by the engine, it is known then, and it is the custom to give the signal and notify the engine to come in and do the switching. Whenever the cars are coupled together, all of the elevator men know, from experience, that the next movement is the giving of the signal and notify the engine to do the switching; and, so far as I know, that has been the custom all the time I was there." This witness had been in the employ of the elevator company from April, 1896, till the time he testified.

The coupling the cars in the elevator together, preparatory to signaling the switching crew to come and take them out, was so obvious that no one on the main floor of the building could fail to notice it, for the reason that the cars, prior to being coupled together, were placed ten feet apart, each car being opposite a hoisting apparatus, and when they were unloaded they were brought together and coupled. The evidence shows this to have been the uniform custom. The deceased, however, did not require this notice. The evidence shows that, before he received the communication from Bougher, heretofore mentioned, he knew the switching crew were coming to take out the cars. Raleigh testified: "On the day in question there were four empty cars on the middle track and four empty cars on the west track. I had coupled the cars on both tracks together. After that I gave the signal as I have described. After that, at the time the cars were brought in, at the time the engine pushed the cars into the middle track, Michael Maloney was at the south end of the elevator; me and him were speaking at the south end of the elevator at the time this switching was being done, that is, when it started. Mike Maloney stood there with me at the place where I gave the signal. He stood there and conversed with me while this switching was going on, about ten minutes, I should judge." Witness further testified: "Michael Maloney and I were standing together when

the engine appeared across the street to pull the switch, and he remained standing there until they moved into the middle track and hitched onto the empties." Also: "Eight loads came down that central track pulling four empties out; then Maloney was standing there by my side, before the switch." The witness says that was the last he saw of the deceased till after the accident. The next we know of the deceased he was at the platform east of the west track, where he received the communication from Bougher, and the next after that is where Donbrowski saw him at a bin on the west side of the track. The evidence shows that the deceased opened the bin as directed by Bougher. It is difficult to understand Donbrowski's evidence in some respects. He is a foreigner and testified through an interpreter. We think it clear, however, from his evidence that the accident occurred about ten minutes after the deceased had opened the bin. No one witnessed the accident. Donbrowski testified that Maloney was following him when it occurred. Maloney was about fifty-five years of age at the time of the accident, and had been in the employ of the elevator company more than thirty years, and therefore must have been thoroughly familiar with the manner in which the business was done, including the manner in which cars were put into and taken out of the elevator, and, so far as appears from the evidence, he never complained of the manner of carrying on the business, and neither he nor any other employe of the company suggested any change. The evidence is uncontradicted that the business was done at the time of the accident as it had been done for many years previous. Under these circumstances the deceased assumed whatever risk there was in the manner in which the business was carried on. L. E. & W. R. R. Co. v. Wilson, 189 Ill. 89, 97; Brown v. Siegel, Cooper & Co., 191 ib. 226, 233; C. B. & Q. R. R. Co. v. Camper, 199 ib. 569, 577.

In 3 Elliott on Railroads, sec. 1289, the author says:

"The employe assumes the risks 'ordinarily inci-
dental to his employer's business, and to the employ-
er's known manner of carrying it on.'" This is
familiar doctrine.

The plaintiff's counsel, in support of his contention
that the court erred in its instructions to the jury,
discusses only the eighth instruction given at the re-
quest of the elevator company, which is as follows:

"The court instructs the jury that this case, as now
submitted to you, is a case between the plaintiff, as
the administratrix of Michael Maloney, deceased, and
the defendant, the Central Elevator Company; and the
court instructs the jury that the defendant, the Cen-
tral Elevator Company, was not responsible in any
way for the management and operation of the engine
and cars while they were being operated by the switch-
ing crew of the Illinois Central Railroad Company;
and if you believe from the evidence in this case that
the injury to Michael Maloney was caused by the speed
at which the cars were put into and upon the west
track in the elevator—then you are instructed that the
defendant, the Central Elevator Company, is not lia-
ble to the plaintiff therefor.

"You are also instructed that the Central Elevator
Company is not liable in any way for the conduct of the
switching crew in question, and if you find from the
evidence that the injury to the said Maloney was
caused solely by the negligence of the switching crew—
if you find there was negligence on their part—then
you are instructed that the plaintiff can not recover
in this suit, and your verdict should be for the de-
fendant, the Central Elevator Company, in such
event."

We are of opinion that this instruction should not
have been given. In the same series of instructions
the court had decided, as matter of law on the evidence,
that the railroad company was not guilty of negligence,
by directing the jury to find that company not guilty,
and, after so instructing the jury, it was, to say the
least, inconsistent to submit to the jury the question,
whether the accident was caused by the negligence of

the railroad company. However, conceding the instruction to be erroneous, we do not think the error ground for reversal, holding, as we do, as matter of law on the evidence, that the deceased assumed the risk, and also that the jury could not have reasonably rendered any other verdict than they did on the evidence. The evidence was such that had the verdict been for the plaintiff, it must have been set aside.

The judgment as to each of the appellees will be affirmed.

*Affirmed.*